Good morning. My name is Kevin Little, and I am the attorney for Appellant Sherry LeFay. I'd like to reserve a couple of minutes for rebuttal. The District Court granted summary judgment as to Mrs. LeFay's Fourth Amendment claim, based on her hasty 5150 hold, when the evidence strongly suggested that all she was was a victim of domestic violence, who was trying to get away from her abusive husband. If permitted to stand, the District Court's opinion would constitute a dangerous troubling precedent, for a number of reasons. First, as the District Court concluded, there would be a lower standard for probable cause in the context of 5150s, as opposed to criminal arrests. There is no support in the law for that proposition. Indeed, the District Court cited none. Second, the uncorroborated, disputed word of an estranged abusive spouse could justify probable cause for... You know, you add the words estranged and disputed and abusive. But what the hell is a police officer? He gets called on the scene, and he doesn't know the history. He doesn't know who's abusive and who's estranged. So, you know, you're loading a lot of terminology in here. A poor officer really is in no position to be aware of these concepts. But what he has is he gets called. There's this man that is telling him certain things about the woman. And some of the stuff that he says is corroborated by her. So I think it would be more helpful to us if you made an argument in less loaded terms. How did it deal with the situation? The officer gets there, doesn't deal with her, and this is the situation she's confronted with. Your Honor, Officer Van Dersen was aware of the history of these two. He indicated in his testimony that he had been aware of at least part of the lengthy call history between these two people prior to making his approach. He also was told by Mrs. Moussaie, because he knew that Mr. Moussaie was estranged from his ex-husband. He knew that there had been a history of disagreements between them. He had made a number of calls. He knew that. How does that tell him about, you know, how does that support his thoughts that he is a abusive estranged husband? Mrs. Moussaie had a very visible bruise on her left forearm that she showed Officer Van Dersen that day and told him that it had been caused by Mr. Moussaie. She showed him that. And he's supposed to believe that? Well, he takes what she says as the gospel truth. I mean, is there something in the prior, can you say, you know, he was aware of prior incidents? Whether incidents where the husband was arrested for having abused the wife? Were there incidents where the husband, were the officers aware that he's been convicted of false abuse or anything like that? I mean, he gets there. There's an altercation. One of the people, the one that didn't call the police, shows a bruise and claims it was inflicted by that. How is the officer supposed to sort that out? How is she supposed to make the judgment? Oh, this is the abusive husband, as opposed to this is the wife that tried to hit the husband himself while trying to... He doesn't know. Well, I think... It's like in traffic, actually. You know, you're in the car and you think, you know, the guy hit me. The police come along and they say, well, we don't know who hit whom. You know, all we know is that two cars have collided in the... How does the officer make that decision? Well, I would hold Officer Van Dersen to his own standard in that case, Your Honor. Officer Van Dersen himself said on page 497 of the record that the injury is something that, had he been aware of it, he of course denies being aware of it, it would have required him to investigate further. And that's exactly what POST requires when you go to a 5150 situation where there is an underlying domestic disturbance. It requires you to calm the situation down, to make sure you get the full story, and then, and only then, to make the determination. In this case, Officer Van Dersen made his determination. After speaking in an interrupted fashion to Mrs. Lafay for only three minutes. What's that? For only three minutes. He spent eight minutes on scene and he himself says the majority of that time he spoke to Mr. Lafay. Yeah, who said she, she, um, claims I'm stealing her purse. Correct. Which is? Yes, sir. And she says, yeah, you may have been stealing my purse. So it corroborates the husband's story. Well, Officer Van Dersen says he drew no conclusions that Mrs. Lafay was delusional from the fact that her purse was missing. He indeed made no determination one way or another whether the purse had actually been stolen or whether she was delusional thinking it was missing. And as we know, from the circle of domestic violence, one way that that occurs is you take the person's ability to move away, you take their financial independence away, and by stealing the purse, as alleged by Mrs. Lafay, Mr. Lafay accomplished all of those things. And officers are trained to recognize those things. Yeah, so let's, let's suppose, let's suppose I agree with your argument that there, that there was likely not probable cause here, so there was a constitutional violation. Why does the officer still get qualified immunity? He does not get qualified immunity because it's been very well established, even in this circuit as far back as, I believe, 1988, in the Magee case, that the same level of probable cause that exists for a criminal arrest has to exist for 51-64. Got it. Yeah, but qualified immunity requires a finding, requires an additional finding on our part to find civil liability. So even if we thought that there was a Fourth Amendment violation here, we can't find that there is, that there's civil liability under 1983 unless we find that the officer should have known exactly what the standards were, and that it would have been obvious to an officer that he was not entitled to act in this way. So it's a different, it's a different standard. Understood. I think one great example of that is if you look at Post Domain 37, which speaks exactly to the situation that occurred here. Officer Van Dursen admits that he was trained in this learning domain, and he failed to follow any of its duties. He also, he was also an officer who had quite a bit of experience as an EMT and had taken quite a few people in on the flight 51-15. That's, and that's, that's correct, and he had been to many scenes like this. And with respect to another piece of evidence that was ignored in the record, we had a police procedures expert who the district court failed even to acknowledge or mention in its summary judgment opinion, who gave a litany of reasons why the officer's actions were unreasonable, first and foremost. However, even with such an expert opinion, even with, when I'm looking at whether the officer would have been on notice of violating the law, I'm looking at some case law that would suggest, if the officer had known the case law, that he would have been violating. I couldn't find such a case. Well, I, I think there's a two-fold basis in the case law. The Meade case, which I think is from 88, the Moynihan case, which is more recent, I think, 05, then also, there are. So if I don't think, so if I don't think those two cases are enough, is there another? Yes, Your Honor, there are a number of cases which. Because, frankly, it seems to me that I have a Hahn versus City of Folsom case where a police officer went the other way in similar circumstances. And I couldn't find another case that was exactly like this one, which really would have said to this officer one way or the other. In the Folsom case, it was pretty straightforward that it was a similar situation to what we had here. This is where, in the Folsom case, if you don't remember it, it's where the mother and dad asked the police to assess whether their 20-year-old, 23-year-old son needed to be placed on hold. And the officer listened to what they had to say, did what they suggested he should do in confirming it, and then said no. But in that particular case, given those instances, the officer said no. But even if the officer had known about that, wouldn't necessarily have said to him, I'm violating the law if I'd have gone the other way in this particular case. Where there are things that she said, that she even admits she says, that would lead in the other direction. Because she says that she told them certain things, she'd not eaten any meals for three days. She told them, she didn't tell them certain things, but she told them that. She told them she was being treated for fibromyalgia, general body pain, and depression. She told them, she admits she's wearing clothes that has an unkept appearance because she had been packing. There are other things. I mean, I'm trying to look at just the facts she talks about, which the officer now could look at. And then I'm trying to find the case which would suggest he wouldn't have qualified immunity. Well, Your Honor, 5150 arrests are by definition all arrests in neither situation. In the near-meet cases that this Court has decided, the Brougham v. Burr booting case, ARB, and the Mendocino case, Fuller v. Havel, all of which are cited in the briefs. You have to perform a reasonable investigation under the circumstances. And when you come to a situation of domestic discord where someone is upset, they are injured, and you only spent three minutes speaking with them, that is not reasonable and that does not entirely unqualify to be an indeed. If we look at Officer Van Dersen's own actions, he says that he did not have a chance to determine whether Mrs. LaFay's apparent signs of dehydration were consistent with dehydration or whether it was just merely fatigue. He says he did not have a chance to suggest that. I thought she said that she hadn't eaten no junk because she saw the hospital's poisoning. She never said she had not drunk and indeed, Officer, not eaten. She said she had not eaten meals. And then Officer Van Dersen admits that he never delved further to determine whether she had eaten snacks. Snacks. That's correct. He only specifically asked her if she had eaten meals, not whether she had eaten anything. Well, no, no. She did say, she did also say she could not remember consuming liquid. Well, she says she couldn't remember the last time she consumed liquid. But in that respect, Officer Van Dersen says he didn't feel like he had a chance to delve into an issue. What prevented him? This was not a time-limited investigation. He could have spent as long as he wanted to dealing with these people to make sure he ferreted the truth before he involuntarily committed this crime. Moreover, with respect to dehydration and malnutrition issues, those are directly contradicted by the medical evidence once Mrs. LaFay got medically checked. There was no sign that she was either malnourished nor dehydrated. She was weighed in at 5'6", 160 pounds, and her initial med check shows that she was hydrated. She was described as a well-nourished, hydrated individual. And what does that mean? Well, it shows that there's a grave doubt as to the reliability of Officer Van Dersen's determination. When she sees the police out there, they don't, you know, he can't do a test to identify her. The husband says she doesn't eat or drink because she thinks I'm poisoning her. She makes statements that sound confirming to me. I mean, maybe if you parse them carefully if you're not a lawyer, and if you conduct cross-examination, you might find that very, very, not cool. But, you know, essentially they confirm what the husband says. He's supposed to conduct a test then and check to see whether she's hydrated or not. Well, Your Honor, I don't believe what defense is supposed to make later. How does that cast doubt on his decision at the time before the test was taken when he doesn't have equipment to take the test? This was right after she was taken in for a medical evaluation, Your Honor. Okay, yeah, I understand. But it's afterwards. This is how time works. Right. You can't relate to it. How does he know? He doesn't know that that's what the defense is going to show. Right. He has no ability to conduct the test himself. He doesn't have the equipment. True, but even by his own admission, he did not know at the time. And he needed to know to determine probable cause. So are you saying that he didn't give her a test before hydration? I'm not saying that. I'm saying that, however, he couldn't rely on the husband's words particularly when he knew according to the record. She says, I don't remember the last time I've drunk. I haven't taken meals, you know. Generally, she seems to confirm what the husband says. What does throwing in the fact that later on she is chosen to be hired mean? How does that possibly bear on the situation? Well, it goes to the issue of his credibility, and it also goes to the fact that How does it go to the issue of credibility? If Mrs. LaVey, after being transported to a hospital in an ambulance where assumedly she did not eat a meal nor drink liquid and did arise appearing hydrated and nourished, how did she look any different to Officer Van Dersen? Well, the question is not whether she, in fact, is. The question is whether he has cause to believe that she is not hydrated and that she hasn't been eating. The fact that it turns out later, she's given a test and the test shows the opposite. I just don't see how that bands on it. Well, what I think does bear on it, Your Honor, is Officer Van Dersen had to do his own investigation. And if you look at the petition, which is on page 221, it says in the fine print, The following facts have been deemed established, and these are what he's representing. His investigation showed that justified asserting this 5150 rule against Mrs. LaVey. But in his handwritten section that appears below, all it is is Mr. LaVey's allegations. He did not take any reasonable amount of time to de-escalate the situation and to make his own determination as opposed to relying on the determination. I have a tough time with your argument about that because if an officer comes into a situation, he's got two people fighting, and he now takes, he's got to take one of them first. He takes one, then he tries to go confirm the allegations in the second. That's why when I looked at this, even taking your facts and taking them exactly as you suggest them, I looked at what did the husband tell the officer because that's what we've got to really look at because it's the officer's idea of the problem cause. So then I take your facts and I say, okay, what part of your facts can confirm what the husband said? Confirm. And all I thought that this statement that you're referring to there is what the officer felt was confirmed of what the husband had told him. That's why he thought that was the way it was. He isn't saying the husband thinks it. That's what he thought after visiting with the husband, visiting with the wife, looking at the situation. These were the facts confirmed to him. If he had never talked to the wife, that's one thing, but he did. I disagree in a few important respects. Mr. LeFay said that Mrs. LeFay was delusional. Officer Anderson said she was alert, responsive, and indeed he did not conclude she was delusional. Well, that says that he doesn't take the husband's side. That says he makes an independent determination against what you're talking about. But yet he writes in the 5150 petition that she was delusional. I understand what he wrote, but I also understand what he said. But everyone who is making a decision whether to commit this poor woman is looking at what he wrote, and he says she's delusional even though he subjectively concluded that she was not. With respect to Alzheimer's, that's a non-issue. That's a neurological condition. That's not a mental health condition. Thank you. Okay, we'll be on the other side. Good morning, Your Honors. May it please the Court, Erica D'Amarino on behalf of the City of Fresno appellees, specifically Officer Daryl Anderson. My remaining three defendant officers are not subject to this appeal, and therefore, summary judgment should be affirmed as to those three. That would be Sergeant Lynn Gleim, Detective John Gomez, and Officer Eric Canabaker. With respect to Officer Anderson, it's undisputed that he had played a probable cause to place the 5150 hold on Ms. Lafay. And this decision was, in fact, confirmed at the hospital when she was presented to St. Agnes, where the policy of the hospital is that when the attending physician as well as a social worker meet and assess the patient, they could at that point release the hold if they so chose. In this particular instance, she was not. She was instead transferred to behavioral health to be evaluated by a psychiatrist. So Officer Anderson's decision to place the hold was, in fact, confirmed by the emergency room physician and social worker. There's information in the record that perhaps the social worker may have not have spent too much time with her, or perhaps she may have seen her while she was sleeping. However, that was never explored in discovery. The social worker was never identified. The social worker was never deposed. And so that argument is very weak. And the bottom line is the policy of the hospital allowed for the hospital to transfer her to get that psychiatric treatment, which confirms Officer Anderson's decision to place the hold. The probable cause that he had, the information Officer Anderson had when he arrived on scene, and again, just like the court noted, based on his extensive experience, he was not only an emergency medical technician, he was also a paramedic for 10 years before becoming a police officer. And based on that experience, the undisputed facts show that he did have information about at least one prior call regarding this couple, and that happened about an hour before he arrived. Two officers from the Fresno Police Department arrived, responded to a call that Mr. Lafay placed as the victim, alleging that his wife was screaming and yelling, taking prescription drugs, throwing things about, threatening to break out his windows. Anderson did have that information when he arrived an hour later. Again, to a call that Mr. Lafay placed, this time alleging that his wife was now attacking him. Mr. Lafay is a disabled elderly man, as is Ms. Lafay. She's an elderly female who exhibits the symptoms of having a disability. Officer Anderson knew that Ms. Lafay admitted that she was suffering from mental depression. Upon him questioning her and her medical history, she became easily agitated and angry. He knew that she admitted, just as the court noted, that she hadn't eaten in days. She had every opportunity to say, oh, but I've been snacking, but she never said that. She never told him that. She never denied jumping on her husband. When specifically asked, she was more concerned about this purse that her husband continuously is stealing from her. That was what Officer Anderson was specifically asked in his deposition with respect to the delusion. Did you think that her thinking that her husband stole her purse made her delusional? No. Vanderson said no. That wasn't what he thought made her delusional. The delusion is her thinking that her husband is trying to poison her. That was the fact that Vanderson acknowledged was delusional. He also, based on his training and experience, evaluated her and determined that she was malnourished and dehydrated. This, I think, was later corroborated in her 70-minute recorded interview where she said she tried to spit on her husband, but she couldn't because she didn't have any spit. That coincides with a person who's dehydrated. To Officer Anderson, she also So I tried to determine if one could appropriately say the police officer had a probable cause, and I looked at what is generally used for 5150 holds. There's an attempt to commit suicide or a threat to commit the suicide in bias. Poulter talks about killing him. That guy talked about killing himself if the wife divorced him. He had access to gun and pain medication. In heater, the plaintiff was intoxicated, had to be restrained, and said he would kill himself. And in the other case, it was where an individual's behavior was extremely dangerous and erratic. And it seemed like this case really meant any of those. So I was having a tough time, really, with whether there was a probable cause. Well, 5150 requires that Officer Anderson observe behavioral symptoms, not necessarily make a medical diagnosis. And what he observed was that she was a danger to her husband, who he indicated had a back disability. She jumped on him and was attacking him. So she was a danger to him. In addition, based on his observations of her having to hold on to furniture as she was walking, claiming to have fibromyalgia and pain all over, the fact that she was so weak and had a body odor that even the paramedics said was so bad you wanted to put gloves on, this created a concern for him that perhaps she was gravely disabled as well. So the danger to her husband and the grave disability as a result of her mental depression is what meets the criteria to 5150. Given Merriman v. Walton, an officer may not have probable cause if a reasonable officer would have made further inquiry before effecting the warrantless detention. Shouldn't this officer have investigated more? He only spent three minutes with her. The three minutes is an argument from the appellants. I understand what it is, but it happens from the clock. Right. And our officers are put in situations, especially on a night in that beat, where they have to make split-second decisions. In this instance, based on his experience, he was able to evaluate her rather quickly, and I believe his testimony was he spent 60% with husband, 40% with wife. I don't believe he ever said three minutes, but that's subject to check. How much time do you need to evaluate someone who's not being cooperative, who isn't able to give a concise, clear, short statement to the questions that were posed to her? He also corroborated that with her husband, who, at least to Vanderson, appeared very genuinely concerned about his wife. He didn't want her arrested for attacking him. He wanted her to get medically cleared and get help. Whether that was a ploy, whether he was acting, whether that was fake, how would Officer Vanderson know? If we were to determine that there is no probable cause here, in other words, the district court was too quick on its call that there was probable cause, so now we're really looking at qualified immunity. The district court really didn't get to qualified immunity. Should we send this back to the district court to determine qualified immunity? I believe your honors have the authority to grant qualified immunity. Here today, Officer Vanderson conducted this investigation reasonably. He conducted it the way an ordinary, prudent person would, and he had good faith belief that he was doing the right thing under the law as he knew it at the time, based on the facts that he was confronted with. There's no evidence that any officer would have done anything different. In fact, I think her 70-minute interview after the fact corroborated everything he said. In fact, she provided more probable cause in that interview. She said she hadn't eaten in three days because there was no food in the house, because she was too sore to go to the store, that her house was a filthy, filthy, filthy pig pit because she was no longer able to keep up with her home. And as far as the bruise is concerned, Officer Vanderson declares her a penalty for treason. She never showed him a bruise. Whether she showed the officers who came an hour before, possibly. Whether she showed the paramedics, possibly. But what she did say is she suffers from brain fog, which causes her to be really confused sometimes, and perhaps she's just mistaken about that. That may be a disputed fact, but it's not genuinely disputed. Vanderson never saw the bruises. Had he saw the bruises with his paramedic experience, being a police officer, he definitely would have investigated further. Based on what he saw that night, he was convinced that Ms. LaFay needed medical help. And that's why you made the determination, and therefore, summary judgment should be affirmed as to Officer Vanderson. The city also has an appeal in this case with respect to the courts in November. Oh, I'm sorry, before I even go there. With respect to the city of Fresno, there's been no evidence to show that there's any unlawful policy, practice, or procedure as to the city of Fresno. And if Officer Vanderson hasn't committed any constitutional violation, then there really is no claim against the city of Fresno. It really seems from the record that what plaintiffs want is that if it goes back to court, they want their Monell claim revived. That's what it seems like they really want. I don't know that they're appealing the Monell ruling here necessarily. They may even have waived it. But all they're suggesting is, if I win here, I want to be able to pursue my Monell claim when I go back to court. I believe the briefing specifically pointed to two interrogatories that the city responded to, and what the panelists were arguing is that because— I understand your argument, but I want you to think about it. If you look at the statement of the case in the opening brief, you look at the footnote, you look at what the district court said about the Monell claim, and finally in the reply brief, it's all about defending the Monell claim at trial. I'm not sure it's in front of us. Okay. I understand your argument. Would this be a matter for the district court to sort out a remand? If there is a remand, whereas the Monell claim gets revived, that's a— That may very well be true, and I just didn't want to waive my opportunity to argue that issue here. But I can move on. With respect to the city's appeal, it's as to— Attorney's fees, is what you're talking about. Correct, correct. The attorney's fees ordered in the November 18, 2014 order. That was an order after the city filed the motion to modify the scheduling order to allow for the late exchange of expert reports. In that motion, the city was a prevailing party, and in that order, the court found that there was no bad faith on part of the city, there was no gamesmanship, there was no willful failure, and in fact, the court— I don't believe any of those things. I mean, it sounded to me like, well, the city said, look, city cost is cost to be borne by the plaintiff. So if you want, with the relief you seek, but you pay extra money that you're imposing on the other side, it seems that the kind of thing that district judges do all the time is to deny the relief, which would have been harsh. So, okay, we'll grant you the relief, but this is now imposing additional costs on the side. You get the relief you want, but you have to pay the height. How can you possibly challenge that? Well, for the fact that, again, the court also acknowledged that part of that delay that gave rise to the city's need to file that motion was due to the appellant's failure to provide discussion. That's what the judge looked at the situation, and looking at all of the considerations, decided that, you know, you're the one who caused the problem to the other side, and to make it seem you, instead of denying you the relief that you seek, you get the relief, but you have to pay the straight. It's not a determination that you're bad people, or it was bad faith, or anything else. It was just simply spilling over the baby. Right. And I would think that you guys would be grateful to the judges for not denying us the relief and coming up with a solution that, you know, lets us do this thing which we're not entitled to do, but, you know, make sure it doesn't impose costs on the other side. I understand you're saying it's taken in the district judge. I understand your argument. And avoid having him deny you the relief the next time for being bad sports. Right. And the city was grateful. In fact, the city proposed a less... Grateful enough to, you know, your office is complaining about it. So, I don't know. That's not how I, you know, when I seek gratitude, it doesn't usually involve sort of an appeal and complaint. I would have it say that you offend the judge. And I thank you for that. You know what I'm saying? But, you know, basically, that's the spirit, isn't it? Absolutely. And I may just do that, but the fees were excessive. And here's why. The city proposed a less drastic sanction. And the court agreed and said, in this hearing, that the city would be limited in its expert, would have to use this preliminary rough draft dirty report, and that's what he's limited to. In addition, he is not allowed to comment upon opposing counsel's expert. Fine. And that was all discussed during the hearing. We argued that. At no time during that hearing did the appellants even request attorney's fees. That was never a subject of that underlying hearing. I just want to confirm. As I understand it, when we were having this conference, the court invited the parties to submit formal motions about the discovery dispute, right? And you're the only one that brought the motion. With respect to the motion to modify the scheduling order? Yes. Or even with respect to anything to do with the discovery dispute. The plaintiff brought to the court's attention your failure to comply with the discovery dispute conference. But the court said at that point, hey, this is just in a general conference. If you want to do something about that, file a motion. Correct. At that point, you filed a motion to extend the deadline. The plaintiff didn't file any motion whatsoever. Correct. Not for fees, not for anything. Correct. Not until after the court gave him, unilaterally, the opportunity to file a motion for fees.  Thank you, Your Honor. Your will, Your Honor, will be in the judge's report. Please take it. Your Honor, I must correct some serious misstatements of the record. No one at the hospital confirmed the 5150 determination. The record is very clear. They didn't release her, right? Well, Doctor, that's They said they're on to the next step. They could have released her. Yeah, well, they could have. The only person qualified at St. Agnes where she first went was the social worker who instead decided it was better not to wake her up. The first time that she was medically assessed, that she received a 5152 screening Well, the social worker works for the doctor, gets information from the doctor. She was examined by a doctor. There was a social worker involved after certain time, and the doctor decides it's best to let her go. The doctor himself There's no misstatement of it. It's perfectly clear what the opposing counsel said. The doctor himself admitted he was not qualified. Not every physician, not every MD is qualified to make a decision on a 5150. You have to have a certain certification for a middle-health training, which the ER physician did not have. The only one who had the authority to either release or impose or continue the 5150 at the hospital was the social worker. And she did not I'm sorry. The doctor is not qualified to talk to the social worker and give the social worker his assessment of her condition. He's not qualified to do that. There's no indication in the record that that ever occurred. I'm sorry. Did you hear my question? I'm sorry. Did you hear my question? Yes, there's no indication in the record that Did you hear my question? I did, but I might have misunderstood it. The doctor is not qualified to tell the social worker his assessment of her condition. He's qualified to say that, but there's no indication in this instance that it occurred. So what? Why does there have to be an indication of that? How do we know it happened if there's no evidence? How do we know it didn't happen? Because, Doctor, I mean, you can claim to use it. You know, she acts on her own. But we don't know. You didn't ask the question. With respect to the evidence shows that the first time that Mrs. Fayot was screeched, she was released. And this is something that shows the district court's error. It relied on it. It made an assumption that was not supported by the record, that this poll was somehow confirmed. First of all, probable cause is based on what the officer knew, not what happens at the hospital. And second, that's the same problem with this 70-minute interview that was referring to that occurred months later. That shouldn't be considered either in determining whether there was probable cause that existed. So you want to consider the tests that happened afterwards, that consider the fact that she was found to just be dehydrated, but all those stuff that doesn't help your client, you think should not be considered? Well, you raised yourself. Dehydration issue bears on officer Fayot-Durston's grant bill. It's still active. But within the standard, yes. Thank you. Case resolved. We'll see you soon.
judges: Kozinski, Bybee, N.R. Smith